TATE, Judge.
The central question of this litigation involves fixing a boundary. Defendant appeals from judgment sustaining plaintiff’s contentions as to the location of the boundary.
Plaintiff Owens owns record title to Lot Five of Block One of a Gayle Subdivision in Lake Charles, while title to Lot Four immediately north thereof is held by the defendant Miller corporation. Alleging that the north line of his Lot Five (and therefore the boundary between it and defendant’s Lot Four) was a fence line, plaintiff initially filed a jactitory action claiming that his title was slandered by defendant’s wrongfully claiming to be the owner of the northern 6}4 feet of his lot, a strip within plaintiff’s fence line.
Defendant answered, admitting the slander and claiming ownership of the contested strip; and by reconventional de *774 mand alleging that a boundary had never been judicially fixed, the defendant requested that same be done — in effect, converting this action into a boundary suit. To this reconventional demand, plaintiff filed a plea of ten years’ prescription under LSA-C.C. Art. 853, which plea will be discussed in a concurring opinion.
On the merits, the controversy concerns an attempt to ascertain the correct boundary line between plaintiff’s Lot Five and defendant’s Lot Four of Block One according to the Mandell 1934 survey (P-D-l, Tr-19), by which the Gayle subdivision in question was first laid out. The plat of this survey did not denote directions nor specifically tie in the subdivision lines with any governmental section lines, although the caption indicates that the Gayle subdivision thereby laid out was located in Blocks 13 and 14 of the earlier Evans subdivision of the NW!4 of the NEy4 of S.8, TIOS, R8W.
Specifically, the dispute between the surveyors respectively relied upon by the opposing parties arises from the differing location by these two surveyors of the north line shown by the Mandell 1934 survey as the starting point or line upón measurements from which the boundary lines within the Gayle subdivision were laid out by Mandell:
A. Surveyor D. W. Jessen, upon whose testimony and his 1950 (P-4) and 1957 (P-5) surveys does the defendant rely, fixed the Mandell north line as along the north line of Section 8, which upon laborious measurement (commencing with a recognized government corner several blocks west of the Gayle subdivision and laying out said section line in accordance with several other fixed points some distance away) he ascertained to be — at the location in question — 31 feet south of an extension of the mid-line of the Missouri-Pacific Railroad right of way.
B. Surveyor F. N. Shutts, upon whose testimony and his 1943 (D-6) and 1956 (Tr-18) surveys the plaintiff relies, found the north line used by Mandell to be six feet further north than Jessen had, or 25 feet south of the railroad mid-line. Shutts testified that surveyors in the Lake Charles area commonly accepted the north line of Section 8 to be 25 feet south of and parallel to the railroad right of way mid-line and that the neighboring subdivisions were laid out recognizing such to be the case; but, he added, whether or not the ideal north section line was actually 25 feet south of the railroad mid-line (rather than 31 feet as established by Jessen), the north line actually used by Mandell was 25 feet distant from the mid-line.
Shutts based this conclusion upon the circumstance that the Mandell 1934 survey showed the north line used by it to be an extension of the north line of the High Mount subdivision, which had been laid out by the Shutts firm and which was 25 feet (rather than 31) south of the Missouri-Pacific mid-line; and also upon the fact that the lot boundary stakes, block and street lines, and the occupation fences within the Gayle subdivision were correctly situated accepting the Shutts (25') line, whereas accepting the Jessen (3F) line such artificial monuments were all approximately & north of where according to the Jessen surveys they should be by ideal location.
Jessen based his opposing conclusion that the Mandell north line should be located 31' south of the railroad mid-line (rather than 25/ south as contended by Shutts) upon his belief that it coincided with the north line of section 8 — based upon a 1918 survey (P-3) of the Evans Subdivision (Blocks 13 and 14 of which were re-subdivided to form the .Gayle subdivision with which we are here concerned), which indicated the Evans north line (and therefore Gayle’s north property line) to be based upon the north section line of Section 8; and upon Jessen’s probably correct assumption that in laying out the Gayle subdivision Mandell must have intended to use as a starting point Gayle’s north property line according to his title — ; *775 and upon Jessen’s laborious establishment of, according to him, the correct or ideal north section line of Section 8 as 3F south of the railroad mid-line at the block in question.
We think, however, that the District Court correctly accepted the Shutts line and survey as correctly establishing the boundary lines of the Gayle subdivision and of the lots therein belonging to the parties to this lawsuit.
For, as stated above, the Mandell 1934 survey does not tie in any of its lines or bounds with any governmental section lines or natural or artificial monuments other than that its north line is shown to be an extension of the north line of the High Mount subdivision; which without contradiction is 25 feet south of the railway mid-line, and which therefore corresponds with the Shutts rather than the Jessen line. And, as testified by Shutts and corroborated by the plats of the various Shutts and Jessen surveys introduced in evidence, the stakes or stobs and the fences fixing the boundaries of the various lots within Block One of the Gayle Subdivision, as well as the block and street lines pertaining thereto, indicate that the north line used by the Mandell 1934 survey in laying out the subdivision — pursuant to which plat the lots in the block were sold and purchased — was indeed an extension of the High Mount line rather than the theoretically correct ideal section line six feet south thereof established by Jessen.
As stated recently by our brethren of the Second Circuit in Hall v. Bairfield, La. App., 92 So.2d 753, at page 756:
“In the re-establishment of lines and corners of a given subdivision monuments within such subdivisions should be accepted as correct locations in preference to a subsequent survey. Barker v. Houssiere-Latreille Oil Company, 1925, 160 La. 52, 106 So. 672, and monuments, either natural or artificial, used to mark either lines or corners, are to be considered more reliable than courses or distances, and prevail in case of conflict.”
“The object in all boundary questions is to find some certain evidence of what particular land was intended to be conveyed,” City of New Orleans v. Joseph Rathborne Land Co., 209 La. 93, 24 So.2d 275, at page 281. Stating that artificial monuments “consist of marked lines, stakes, roads, fences, buildings, and similar matters marked or placed on the ground by the hand of man,” 24 So.2d 280, the Supreme Court held in this Rath-borne case that the boundary marked by an earlier survey of adjacent property, when used as a boundary and point of reference in the initial survey of the property therein involved, constituted an artificial monument which was a better guide to establishing the boundary line intended — where its location by the survey was uncertain — than an ideal and theoretically correct line established according to courses and distances.
See also the almost classic summary in Meyer v. Comegys, 147 La. 851, at page 858, 86 So. 307, at page 309, in which the Supreme Court through Judge Dawkins, Sr., stated that “the legal guides for determining a question of boundary, or the location of a land line, in the order of their importance and value, are: (1) Natural monuments; (2) artificial monuments; (3) distances; (4) courses; and (5) quantity. But the controlling consideration is the intention of the party or parties.”
Shutts testified that his 1943 survey of the Block One of the Gayle Subdivision was made at the request of defendant corporation’s partnership predecessor, prior to this Miller partnership’s purchase of Lot Four and other property in Block One. At that time, he found the boundary stakes and occupation fences within the block' situated in accordance with his survey, which used a north line 25 feet south of the railroad mid-line as a starting point.
*776 The president of defendant corporation, who was the partner principally concerned in the purchase of the property in question, testified that he bought according to the Shutts 1943 survey. (Tr-119.) He further stated that the south boundary line of Lot Four (which is the north line of Lot Five and thus is the boundary line the fixing of which is the principal subject of this appeal) was then marked by a hedge or fence which was in accordance with the Shutts rather than the Jessen line. (Tr-116.)
Brown, owner of Lot Six and plaintiff’s neighbor to the south, stated that he had lived there for 22 years and that the boundary line between his Lot Six and plaintiff’s Lot Five, was marked by iron corners which corresponded with the Shutts survey (and not the Jessen survey which would have required their location six feet further south). These indicated what by occupancy and boundary marks he had always considered to be the line between his lot and Lot Five (now owned by plaintiff) to the north thereof.
Thus, by the Shutts surveys the boundary lines are located according to the boundary stakes, buildings, fences, and other artificial monuments reflecting the prior understanding of those who bought and sold lots in the subdivision as to where the subdivision’s property lines had been intended to be situated by the Mandell 1934 survey.
But if we accepted the Jessen surveys as correct, the fences and boundary stobs actually found on the ground would be about six feet north of where they ideally should be: for instance, plaintiff’s north property line is according to Jessen six feet south of his fence and runs through a small portion of his residence (which house was sold and removed from the lot subsequent to filing of this suit) ; his southern boundary is also six feet south of the stobs long considered by his southern neighbor to mark the boundary line between the lands; and the southernmost lot of Block One likewise loses six feet on its north but gains a six foot strip which is actually situated within the street bed.
We think that these artificial monuments and actual occupations established by those who purchased lots in the Gayle subdivision as laid out by the Mandell 1934 survey, being in accordance with the north line as re-established by the Shutts surveys, indicate the intention of Mandell and the subdividers and those who bought from them to lay out, sell, and buy lots in accordance with a survey and subdivision based upon the line re-established by Shutts and 25 feet south of the railroad mid-line; and not upon a theoretically correct or ideal section line 6 feet south thereof, as contended by Jessen. And to accept the Jessen surveys would require all the property owners within the block and the subdivision to change the lines long accepted by them to be correct. Cf. Thomas v. Patenotte, La.App. 1 Cir., 47 So.2d 62.
Although we are agreed that, on the merits, the trial court’s judgment should be affirmed, a majority of this court (not including the present writer) also feels that we should overrule the plea of prescription filed by plaintiff under LSA-C.C. Art; 853, based upon visible bounds allegedly fixed by mutual acquiescence and existing for over ten years. These views are set forth in a concurring opinion.
For the above and foregoing reasons, the judgment of the District Court is affirmed.
Affirmed.